MANDELL S. SIFF and JEAN F. SIFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Siff v. Commissioner
Docket No. 6451-77
United States Tax Court
T.C. Memo 1980-566; 1980 Tax Ct. Memo LEXIS 19; 41 T.C.M. (CCH) 587; T.C.M. (RIA) 80566; December 18, 1980
*19 Carle E. Davis and Joseph C. Wool, Jr., for the petitioners. Stephen M. Friedberg, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1972 and 1973 in the amounts of $ 13,501.23 and $ 18,326.25, respectively. Concessions having been made by petitioners, the issues remaining for our decision are: (1) whether petitioner Mandell S. Siff received a constructive dividend in 1972 by virtue of a $ 30,200 payment made by his wholly-owned corporation to the Bank of Virginia in 1971 in satisfaction of certain personal obligations; and (2) whether transfers of $ 42,435.55 in inventory during 1973 by corporations controlled by petitioner Mandell S. Siff to a newly-formed corporation were made in satisfaction of an obligation to provide such inventory to the new corporation as part of the cost of a $ 75,000 stock subscription and therefore resulted in a constructive dividend. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, the exhibits attached thereto, and the exhibits stipulated *20 at trial are incorporated herein by reference. Petitioners Mandell S. Siff and Jean F. Siff, husband and wife, resided in Richmond, Virginia, on the date the petition herein was filed. Petitioners filed joint Federal income tax return for calendar years 1972 and 1973 with the Internal Revenue Service Center, Memphis, Tennessee. [1] Jean F. Siff is a party herein solely by virtue of having filed joint returns with her husband and therefore, Mandell S. Siff will be referred to hereinafter as petitioner. Petitioner is the sole or controlling shareholder, and president, of Shevel's, Inc., Willow Lawn; Shevel's, Inc., Eastgate Mall; Shevel's, Inc., Colonial Heights; Shevel's, Inc., Chippenham; Shevel's, Inc., Southside Plaza; and Shevel's, Inc., Main Street. These are separate corporations, each selling men's clothing at retail. Each corporation operates a retail store *21 and each maintains separate books and records. The corporations share a central office and although they do not have a common warehouse, they obtain the benefits of common inventory by transferring inventory among the individual stores on an "as needed" and "as can spare" basis. It was the general practice for each corporation to sell 25 percent of its stock directly to its store's manager, to enable the store manager to participate in the profits of the corporation and thus to give him greater incentive to do a better job. Petitioner personally purchased and held the remaining outstanding stock. Petitioner never sold stock directly to a store manager. Prior to August 10, 1971, petitioner owned 75 percent of the outstanding stock of Shevel's, Inc., Willow Lawn (hereinafter Willow Lawn) and Mr. Sidney Keller, then the store manager for Willow Lawn, owned 25 percent of that corporation's outstanding stock. On December 10, 1962, petitioner, Mr. Keller, and Willow Lawn entered into a stockholder's buy-sell and employment agreement. Paragraph 9 of the agreement provides: Siff and Keller agree that neither will sell, pledge, or otherwise dispose of or effect a lien on their respective *22 stock holdings in Willow Lawn without the written consent of the other. In the event of the death or disability of either Siff or Keller, the other have the option to purchase his stock at book value in cash or upon such terms as may be agreed upon between the parties or their personal representatives. A strained relationship developed between petitioner and Keller, and by agreement dated August 10, 1971, petitioner, Keller, and Willow Lawn expressly amended the December 10, 1962 agreement with regard to Keller's employment by, and stock ownership in, Willow Lawn. The August 10, 1971 agreement states in pertinent part: [2]
THIS AGREEMENT, made this 10th day of August, 1971, by and between SHEVEL SIFF, hereinafter sometimes referred to as "Siff", first party, and SIDNEY KELLER, hereinafter sometimes referred to as "Keller", second party, and SHEVEL'S, INC., WILLOW LAWN, hereinafter sometimes *23 referred to as "the Corporation", third party, WITNESSETH
WHEREAS, the parties hereto entered into a certain written Stockholders Buy-Sell and Employment Agreement dated December 10, 1962, and WHEREAS, the parties hereto desire to amend said Agreement with regard to the employment of Sidney Keller by the Corporation and effect the transfer of his stock in the Corporation to Siff on the terms and conditions hereinafter set forth. NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows: 1. Sale of Stock: Keller agrees to sell and Siff to purchase, all of the issued and outstanding stock of the Corporation owned by Keller, namely 500 shares of the fully paid and non-assessable common capital stock of the Corporation, upon payment by Siff to Keller of a sum equal to the book value of said stock as of July 31, 1971, or $ 29,138.78 whichever is greater. The sum of $ 29,138.78 aforesaid is to be paid upon execution of this agreement with excess, if any, to be paid within ten days of final audit or by October 15, 1971, whichever shall first occur. Keller agrees concurrent with the receipt *24 of said sum and the execution of this Agreement by all required parties, to deliver the aforesaid stock certificate to Siff in negotiable form and properly endorsed for transfer by the Corporation to Siff. On July 30, 1971, petitioner borrowed $ 25,000 from the Bank of Virginia (hereinafter the Bank), and on August 13, 1971, he gave Keller a personal check for $ 29,138.78 for Keller's 500 shares of Willow Lawn stock. On November 17, 1971, Willow Lawn gave Keller a check for $ 6,477.48, which represented the amount due Keller under the profit sharing plan. By note dated October 13, 1971, Willow Lawn borrowed $ 36,700 from the Bank. According to the loan application, the purpose of the loan was to enable Willow Lawn to purchase treasury stock previously owned by its manager. However pursuant to instructions on the loan application, the loan proceeds were actually used to repay petitioner's July 30, 1971, personal loan from the Bank and to reduce by $ 5,200 an earlier personal loan to petitioner from the Bank. Willow Lawn repaid its $ 36,700 loan from the Bank by corporate check numbered 13815 dated May 30, 1972. Willow Lawn's records reveal that as of the close of its fiscal *25 year ended July 31, 1972, the corporation had acquired as treasury stock the shares previously registered to Keller, at a total cost of $ 36,677,48, computed as follows: Amount paid to Keller under
profit-sharing plan
$ 6,477.48
Portion of check numbered 13815
dated 5/13/72
30,200.00
$ 36,677.48
These 500 shares of Willow Lawn stock were never reissued. Petitioner was the individual responsible for maintaining the regular books and records of Willow Lawn during the corporation's fiscal years ended July 31, 1972, and July 31, 1973. Petitioner and Merle Foster organized Shevel's, Inc., Colonial Heights (hereinafter Colonial Heights) in December 1972. Petitioner subscribed to 75 percent of the Colonial Heights capital stock at a cost of $ 75,000 and offered to pay for the stock by transferring to the corporation certain inventory valued at $ 75,000. Petitioner's offer was accepted by the board of directors of Colonial Heights at a meeting held on March 23, 1973. At that meeting, the board authorized and instructed the proper officers of the corporation to issue to petitioner 750 shares of $ 10 par value common stock of the corporation "upon the receipt *26 from him [petitioner] of said inventory which in the opinion of the Board of Directors has a fair value of $ 75,000.00." From approximately the date of the organization of Colonial Heights to July 31, 1973, the end of its fiscal year, Colonial Heights received surplus or unneeded inventory transferred from the other corporations. The usual procedure for intercompany inventory transfers during this period involved a transfer ticket and summary sheets of transfers. The transfer ticket was prepared in duplicate in the transferring store and described the transferred inventory at retail market price. The transferring store retained one copy of the ticket and a copy accompanied the transferred inventory. The store receivin the inventory and ticket would endorse the ticket to show receipt, record the ticket and transmit it to the central office. The totals of the transfer tickets were issued by the central office on the summary sheets and the net total owed or owing from one store to another was ordinarily reflected in the books and records of the various corporations at year-end after an adjustment in amount to cost. At the end of each fiscal year, the accountant for each corporation *27 was given the net transfers of inventory, either by phone or in letter form. He was not provided with the actual summary sheets. For the fiscal year ending July 31, 1973, the balance sheet and tax return of Colonial Heights revealed an amount of $ 33,001 due to Shevel's, Inc., Main Street for inventory transfers. However, an additional $ 42,435.55 of net intercompany transfers to Colonial Heights from the other stores had not been reflected on the year-end accounting records and general ledgers or the tax returns of any of the corporations as receivables, payables, or a reduction in cost of goods sold. Subsequently, when a different accounting firm prepared the 1974 tax returns for Colonial Heights, the ommission on $ 42,435.55 of transferred inventory was discovered. Thereafter, the unrecorded intercompany transfers were entered on the corporations' books, and the corporations filed amended tax returns for their fiscal years ending July 31, 1973. Petitioner's subscribed stock in Colonial Heights was issued to him on March 23, 1973. At the time of the stock issuance, petitioner gave no note evidencing his indebtedness to Colonial Heights. The July 31, 1973 balance sheet *28 of Colonial Heights shows the amount of $ 75,000 as "Due from stockholder;" this amount is also reflected as "Loans to Shareholders" on the Federal corporate income tax returns filed by Colonial Heights for its fiscal year ended July 31, 1973. On August 1, 1973, petitioner executed a note evidencing his promise to pay $ 75,000 to Colonial Heights on July 31, 1974. The note does not provide for the payment of interest. However, the unaudited financial statement of Colonial Heights for fiscal year July 31, 1976, reflects interest accruing on the note at a rate of 5 percent. Petitioner paid Colonial Heights $ 80,249, during the fiscal year ended July 31, 1977, which represented payment in full of his August 1, 1973 note plus interest. Foster was the individual responsible for maintaining the regular books and records of Colonial Heights for the fiscal year ended July 31, 1973. In his statutory notice, respondent determined that the payment by Willow Lawn to the Bank of Virginia was for petitioner's personal loan and thus was dividend income. In addition, respondent determined that $ 42,435.55 of the merchandise transferred from the various Shevel corporations had not been reflected *29 on the books of any of the corporations as receivables, payables, or as a reduction of the cost of goods sold. Accordingly, respondent determined that the unrecorded merchandise transfers from the Shevel corporations to Colonial Heights was in partial satisfaction of petitioner's obligation to purchase a 75 percent interest in that company and thus constituted dividend income to petitioner. OPINION The first issue for our decision is whether petitioner received a constructive dividend in 1972 by virtue of a $ 30,200 payment made by his wholly-owned corporation to the Bank of Virginia in satisfaction of certain personal obligations in October of 1971. Pursuant to an amendment to the 1962 agreement between petitioner and Mr. Keller, petitioner in August 1971, agreed to buy Mr. Keller's 25 percent share in Willow Lawn. On July 30, 1971, petitioner borrowed $ 25,000 from the Bank of Virginia, and subsequently gave Mr. Keller a personal check for $ 29,138.78 as payment for Mr. Keller's 500 shares of stock. By note dated October 13, 1971, Willow Lawn borrowed $ 36,700 from the Bank of Virginia. The proceeds were used to repay petitioner's July 30, 1971 personal loan from that *30 bank and to reduce by $ 5,200 an earlier loan by the bank to petitioner. Willow Lawn repaid its $ 36,700 loan from the bank by corporate check dated May 30, 1972. As of the close of Willow Lawn's fiscal year ending July 31, 1972, its records showed that it had acquired as treasury stock the 500 shares previously registered to Keller. Petitioner contends that he was acting as Willow Lawn's agent in acquiring the stock held by Keller, and that the loan repayment did not constitute a constructive dividend to him. Respondent maintains that petitioner received a constructive dividend from Willow Lawn upon its assumption of petitioner's personal obligations of $ 30,200 to the Bank of Virginia. However, based on the information contained in Willow Lawn's records, respondent issued a notice of deficiency to petitioner for the calendar year 1972, believing that it was during that year that his personal loan was paid off by the corporation. The facts reveal and respondent now concedes that in actuality, Willow Lawn assumed petitioner's personal obligations in October of 1971. Therefore, even assuming respondent is correct that the corporate loan payments constituted a constructive dividend *31 to petitioner, it is clear that any such dividend occurred in 1971, not 1972. Since no notice of deficiency has been issued for 1971, that year is not properly before this Court. Therefore, we find that petitioner did not receive a constructive dividend of $ 30,200 in 1972. The second issue for our decision concerns whether petitioner received a constructive dividend of $ 42,435.55 in calendar year 1973 by reason of transfers of inventory to Colonial Hights from other corporations which he controlled. Briefly, the facts are as follows: Petitioner and Merle Foster organized Shevel's, Inc., Colonial Heights with Foster subscribing to 25 percent of the stock for $ 25,000. Petitioner in turn subscribed to 75 percent of the stock for $ 75,000, which, according to their agreement, was to be paid by having petitioner provide Colonial Heights with inventory valued at $ 75,000. At the close of the fiscal year, July 31, 1973, $ 33,001 was recorded on the regular books and records and the balance sheet of Colonial Heights as net inventory transfers to Colonial Heights from Shevel's, Inc., Main Street, and this amount was reflected on the tax return of the corporation. An additional *32 $ 42,435.55 of inventory transfers was not reflected on the regular books and records or on the balance sheet, but was evidenced by transfer tickets and summary sheets not incorporated into the regular records and not used in the preparation of income tax returnes. During 1974, when a different accounting firm prepared the tax returns of Colonial Heights and conducted an audit, it was discovered that $ 42,435.55 worth of transferred inventory had not been recorded. Accordingly, this amount was entered on the balance sheet, and amended returns were prepared for all of the corporations for the fiscal year 1973 which properly reflected the full amount of transferred inventory. Petitioner contends that the records of inventory transfers represented by the tickets and summary sheets failed to find their way into the final 1973 year-end records and financial statements through omission by his previous accountant. Petitioner maintains that none of the transferred inventory was intended to or did in fact reduce his personal liability to pay for the stock, and therefore he did not receive a constructive dividend on account of the unrecorded inventory. For support, petitioner points to the *33 fact that when the errors were discovered, they were remedied, and that the tax return and balance sheet of Colonial Heights on July 31, 1973, properly reflected his entire $ 75,000 obligation for his 75 percent stock interest. Furthermore, petitioner executed a note for the obligation on August 1, 1973, and later paid the note with accrued interest from personal funds. Conversely, respondent maintains that since $ 42,435.55 of net inter-corporate transfers to Colonial Heights was not reflected on its regular books and records or balance sheet, this amount was intended as partial satisfaction of petitioner's obligation to provide $ 75,000 of inventory to Colonial Heights as the cost of his capital subscription.Respondent points to the resolution of his capital subscription. Respondent points to the resolution of the board of directors on March 23, 1973, in which it was recorded that petitioner would be issued 750 shares of Colonial Heights stock upon receipt from him of $ 75,000 of inventory to show that the transferred inventory constituted a constructive dividend to petitioner. We find that the $ 42,435.55 of unrecorded transferred inventory did not constitute a constructive *34 dividend to petitioner. Although the resolution of the board of directors states that the stock would be issued to petitioner upon receipts of inventory, petitioner was in fact issued stock on the same day as the resolution. Despite what the original intention may or may not have been with regard to petitioner's payment for the stock, the record clearly shows that the transferred inventory was never applied in 1973 or subsequently, to reduce petitioner's obligation for the stock. On the contrary, petitioner's full $ 75,000 liability was always carried on the books and records of Colonial Heights and incorporated in its tax return. Petitioner executed a note for the obligation on August 1, 1973, and paid the note with interest from his personal funds. The inter-corporate transfers were a normal and ordinary part of the way the different stores in petitioner's retail business shifted surplus or unneeded inventory. The records which accompanied each transfer reflected the liabilities for the inventory between the stores. The managers of the different stores testified that petitioner never withdrew any merchandise personaly. If, as respondent contends, the $ 42,435.55 of unrecorded *35 transferred inventory was indeed in partial liquidation of petitioner's $ 75,000 obligation, it makes no sense whatsoever that the entire $ 75,000 due from petitioner was shown on the books, records, and tax returns of Colonial Heights at the end of its 1973 fiscal year and at all times thereafter, until it was paid by petitioner with interest. We are satisfied that the failure to record certain transfers at the end of the 1973 fiscal year was an unexplained error, unrelated to petitioner's $ 75,000 obligation for the stock, which was rectified upon subsequent discovery. Inherent in the concept of a constructive dividend is the finding that the corporation did in fact confer some kind of economic benefit on the stockholder in order to distribute available earnings and profits without expectation of repayment. ; ; ; 1 Mertens, Law of Federal Income Taxation, sec. 9.07, p. 17 (1974 rev.) "It is essential to the existence of a dividend, actual or constructive, *36 that the stockholder receive something from the corporation." . In the case before us, the unrecorded transferred inventory was never used for the benefit of petitioner, either by reducing his liability to Colonial Heights or otherwise, nor did petitioner receive anything from the corporations by virtue of the transferred inventory. Therefore, we find that petitioner did not receive a constructive dividend by virtue of the transferred inventory in 1973. To reflect concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. Petitioners filed an amended Federal income tax return for 1972 with the Internal Revenue Service Center, Memphis, Tennessee, on April 12, 1974, claiming entitlement to a $ 1,000 casualty or theft loss deduction. This deduction was disallowed by respondent and petitioners agreed to respondent's adjustment.↩
2. Certain aspects of the August 10, 1971 agrement relating to Keller's continued employment by Willow Lawn were clarified by letter dated August 10, 1971, between the attorneys for the parties to the agreement. Keller's employment by Willow Lawn is not relevant to the issues herein.↩